NOT DESIGNATED FOR PUBLICATION

No. 116,010

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DON CHARLES BALL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed March 23, 2018. Affirmed.

*John Ivan*, of Law Offices of John Ivan, of Shawnee Mission, for appellant.

*Edward J. Bain*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt,* attorney general, for appellee.

Before BUSER, P.J., PIERRON and LEBEN, JJ.

PER CURIAM: D. Charles Ball appeals his convictions for mistreatment of a dependent adult and giving a worthless check. He mainly argues that the evidence against him wasn't sufficient.

As charged against Ball, mistreatment of a dependent adult requires that the defendant take unfair advantage of a dependent adult's financial resources for another person's financial benefit by the use of deception. No one disputed that a dependent adult's financial resources were involved here—and they were held in Ball's trust account.

Ball claimed to have the money and made various excuses for not paying it out, all before eventually writing a bad check and never making good on the missing funds. That evidence was sufficient to convict, and we reject a separate claim Ball makes that the State had to prove that he first obtained the funds through a fraudulent act.

As for the insufficient-funds check, the State had to prove that Ball gave the check with the intent to defraud. He gave the $32,296.46 check to the dependent adult's residential-service provider at a time when there weren't funds in Ball's account to cover it—and he never made the check good. A Kansas statute, K.S.A. 2017 Supp. 21-5821(d), provides a rebuttable presumption of the intent to defraud and knowledge of insufficient funds when the maker of the check fails to make good on it within seven days after notice that it didn't go through. Ball made no attempt at trial to rebut that presumption.

Ball also raises some legal arguments that we have not found persuasive:

- He argues that it doesn't violate the worthless-check statute if the check is given for a preexisting debt. Some states have a rule like that, but nothing in the Kansas worthless-check statute would support its application in Kansas and several decisions of the Kansas appellate courts convince us that this rule is not the law here.
- He argues that the charging documents the State filed against him were flawed, but we find that no defect in the charging documents caused any harm to him in defending against the charges.

We find no error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The charges against Ball arose out of his handling of funds belonging to Richard White III. Richard had suffered a severe head injury in 1979 that left him with diminished mental capacity.

In 1992, Richard was placed in an adult group home operated by Tri-Ko, Inc. Originally, Richard's parents were named as guardians and conservators for him, but after both parents had died, Richard's brother, Rufus White, and his sister, Pamela Anderson, were named co-guardians and conservators in 2003.

At some point, the probate court ordered some residential property owned by Richard to be sold. Richard retained about $14,000 in equity after the sale. Richard's parents left some other residential property to each of their children and about $2,000. Richard received $17,000 for the property bequeathed to him when the city took the property to build a recreation center.

The probate court decided not to leave these assets in the control of Rufus, presumably because Rufus had failed to provide reliable accounting for the conservatorship. Instead, the court ordered Richard's assets to be held in trust by Ball, Rufus' attorney. Additional assets were added to the trust account on behalf of Richard through the distribution of an uncle's estate. Rufus estimated that the amount of money placed into Ball's trust account on behalf of Richard totaled between $40,000 and $50,000.

When Richard first went to Tri-Ko for residential care, his expenses were mainly covered by a state grant and supplemented with Richard's social security disability benefits. At times, Rufus would ask Ball to pay pharmaceutical expenses for Richard out of the trust funds.

In early 2011, Tri-Ko learned that, starting July 1, 2011, the State of Kansas would no longer continue providing the grant that had paid for Richard's living expenses. Tri-Ko notified Rufus and Ball several times, beginning in February 2011, that since Richard held some trust assets, he would be personally responsible for the costs of his care until he became eligible for Medicaid benefits. One requirement for Medicaid eligibility was the lack of personal assets over $2,000. That meant Richard wouldn't be Medicaid eligible as long as more than $2,000 belonging to him remained in the trust account.

Tri-Ko offered two solutions to the dilemma: (1) Ball could pay Tri-Ko for the care of Richard until the trust assets were essentially depleted and Richard became eligible for Medicaid benefits; or (2) Ball could transfer the funds into a special-needs trust, which would not be counted against Richard for Medicaid eligibility.

Ball didn't follow through with either of these options before the state funding ended. At some point, Ball told Tri-Ko that he could not distribute the trust assets without a court order. Once the grant ended, Tri-Ko billed Richard privately at a rate of $8,300 per month, accumulating a debt beyond $100,000. Although no one paid Richard's bills, Tri-Ko did not terminate services. Instead, Tri-Ko retained an attorney, Shannon Johnson, to seek payment from the assets purportedly held in Ball's trust account.

In September 2012, Johnson filed an appearance representing Tri-Ko's interests in Richard's guardianship and conservatorship proceeding. Eventually, Ball moved for permission to distribute the trust funds held for Richard. After several delays, Johnson moved to have the remaining trust assets paid into the probate court.

On January 31, 2013, the probate court held a hearing on the motions for distribution of the trust assets. Ball represented that he still held $38,297 of Richard's assets in trust. The court ordered Ball to distribute $3,000 to the entity preparing Richard's funeral arrangements to pay for a grave marker, $1,500 to Richard's guardian

4

ad litem, $1,500 to Ball, and the remaining $32,297 to Tri-Ko. The court set a deadline of February 15, 2013, for these payments.

But Tri-Ko did not receive any funds by February 15. Since the order did not specify the method of payment, Johnson waited until February 25 to see whether a check would arrive in the mail. When she still had not received payment, Johnson called Ball. He claimed that he had mailed a check but that the letter containing the check had been returned in a shredded condition. He assured Johnson that he was depositing a substitute check in the mail that day.

When Johnson still had not received payment from Ball by March 7, she sent Ball a letter saying that if she had not received payment by March 15, she would file a court motion to compel payment and request sanctions against Ball. On March 14, Ball called Johnson. He said that he had sent a check on February 25 and that he had been involved in a car accident. He promised Johnson that he would deliver another check to her office in person either that same day or the next day. Ball suggested that the check would be postdated. Johnson replied that a postdated check would not be acceptable compliance with the court order. Ball became angry, but the debate about the feasibility of a postdated check has no relevance at this point because Johnson never received the promised check.

Having failed to receive the promised check by the end of the workday on March 15, Johnson moved to compel payment with the probate court. The court set the motion for hearing on March 25.

The morning of the hearing, Ball approached the judge assigned to the case outside the courthouse. Ball said that he had to attend another hearing and could not appear at the hearing on Tri-Ko's motion to compel. He gave the judge a check payable to

Tri-Ko in the amount of $32,296.46. The judge then gave the check to Johnson at the hearing.

That same afternoon, Johnson sent the check to Tri-Ko's offices by overnight mail service. A representative from Tri-Ko, Christie Schrader, deposited the check the next day.

But the check was returned through Tri-Ko's bank for insufficient funds. Schrader immediately contacted Johnson by email and sent her a copy of the returned check as an attachment. Ball has never paid Tri-Ko the amount ordered by the probate court.

An investigation of Ball's handling of the money ensued. It showed that Ball's trust account contained a balance of $1,482.73 on March 25, 2013, and a balance of $1,302.78 on March 26, 2013. The bulk of Richard's money (perhaps all of it, since the money left in the account might belong to other Ball clients) was gone.

Once Tri-Ko learned that Richard no longer had significant assets, they applied for—and obtained—Medicaid benefits for him. That meant Richard stopped incurring charges of $8,300 per month.

The State at first charged Ball with a single charge: giving a worthless check of $25,000 or more, in violation of K.S.A. 2012 Supp. 21-5821(b)(1)(A). Later, the State amended the information to charge the additional offenses of mistreatment of a dependent adult, in violation of K.S.A. 2012 Supp. 21-5417(a)(2) and (b)(2)(D), and theft, in violation of K.S.A. 2012 Supp. 21-5801(a)(1) and (b)(2). After a preliminary hearing, the district court dismissed the theft charge but bound Ball over for trial on the other two counts.

Ball waived his right to a jury trial, and the case was tried to the court on December 8, 2015. After the State presented its evidence, defense counsel moved for a judgment of acquittal on both remaining counts. The district court denied the motion. Ball presented no testimony for his defense, and the court ultimately found Ball guilty of giving a worthless check and mistreatment of a dependent adult.

Ball moved for arrest of judgment or a new trial, raising several issues. The district court apparently denied those motions at a hearing held April 29, 2016, but a transcript of that hearing was not requested as part of the record on appeal. At that same hearing, according to the court's sentencing journal entry, the court imposed an underlying prison term of 32 months (the standard guideline sentence for a person with Ball's criminal-history score) for mistreatment of a dependent adult. The court imposed a concurrent 12-month prison sentence for the worthless-check charge.

Based on Ball's criminal-history score, he was in a "border box" on the guideline sentencing grid. That meant that while his presumptive sentence was imprisonment, the district court could grant probation without having to enter a departure sentence. The court imposed probation for 36 months, with the underlying prison sentence to be served if Ball did not successfully complete his probation. The court also imposed a restitution order for $38,296.46.

ANALYSIS

Before we review each of the issues on appeal, we will note the general standards of review we will apply.

For each of his convictions, Ball argues that the evidence wasn't sufficient to convict him. When the sufficiency of evidence is challenged in a criminal case, we look to see whether the evidence, when viewed in the State's favor, was enough so that a

7

rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1022-23, 399 P.3d 194 (2017). We look at the evidence in the light most favorable to the State because the fact-finder (here, a judge) has already found in the State's favor. Our job on appeal, of course, is not to reweigh the evidence; we simply decide whether it was sufficient to support the fact-finder's conclusion. 306 Kan. at 1022-23.

In his appellate brief, Ball has organized the issues a bit differently than the way we are addressing them here. On both counts, he argues generally that the evidence wasn't sufficient to convict him and makes a legal argument about why the evidence doesn't match a particular legal element of the charge. We have a single discussion of whether the evidence for each charge is sufficient given the legal requirements for that offense.

On these arguments about the legal requirements for each offense, the question is one of statutory interpretation. We determine statutory-interpretation issues independently, with no required deference to the district court. *State v. Kleypas*, 305 Kan. 224, 327, 382 P.3d 373 (2016); *Jeanes v. Bank of America*, 296 Kan. 870, 873, 295 P.3d 1045 (2013). That standard applies to Ball's argument that the bad-check statute doesn't apply when the check is given to satisfy a preexisting debt. And that standard applies to his argument that the State had to prove that he first obtained the funds through a fraudulent act to prove mistreatment of a dependent adult.

Because the elements of a crime are determined by the law in place at the time of the defendant's actions—not statutes enacted later—we will apply the statutory provisions in effect when the offenses were committed. The State alleged the worthless check was given on March 25, 2013, and that the mistreatment of a dependent adult took place between January 2012 and June 2013.

I. *Sufficient Evidence Supported Ball's Conviction for Giving a Worthless Check.*

We begin with Ball's conviction for giving a worthless check. K.S.A. 2012 Supp. 21-5821(a) makes that a crime:

> "Giving a worthless check is the making, drawing, issuing or delivering or causing or directing the making, drawing, issuing or delivering of any check on any financial institution for the payment of money or its equivalent with intent to defraud and knowing, at the time of the making, drawing, issuing or delivering of such check that the maker or drawer has no deposit in or credits with the financial institution or has not sufficient funds in, or credits with, the financial institution for the payment of such check in full upon its presentation."

While the statute uses several terms—"making, drawing, issuing or delivering"—that can have different meanings, there's no dispute in Ball's case that he wrote the check and gave it to the judge for delivery to Tri-Ko. So what the statute required the State to prove in Ball's case was (1) that he issued the check, (2) that he knew then that there were insufficient funds at that time to cover the check, and (3) that he gave the check with the intent to defraud.

There's no dispute that Ball issued the check. And there's no dispute that the bank refused to honor the check because Ball's account didn't have sufficient funds to cover it. So the sufficiency-of-the-evidence issue comes down to whether the State proved Ball had knowledge that the account had insufficient funds and that Ball intended to defraud by issuing the check.

But given the undisputed facts, a statutory presumption sufficiently proved the remainder of the State's case. K.S.A. 2012 Supp. 21-5821(d) provides that—with limited exceptions—issuing a check that's refused by the bank for insufficient funds "shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds" in the

9

account. The only exception that could apply here would be if Ball had made good on the check "within seven days after notice" that the check hadn't been paid. K.S.A. 2012 Supp. 21-5821(d)(1). Ball doesn't argue that this exception applies.

So there was a statutory presumption supporting the only elements of the offense that weren't undisputed. A presumption is only that—it can be countered by evidence. See K.S.A. 60-414. But Ball didn't present any evidence at trial, and his attorney's cross-examination of the State's witnesses didn't counter this statutory presumption, either.

Rather than focusing on the evidence or the statutory presumption, Ball mostly makes a legal argument that the State didn't prove the third element of the worthless-check charge, that he had the intent to defraud. Ball argues that because the payment was for services that had already been provided to Richard, giving Tri-Ko a bad check at that point didn't lead Tri-Ko to do anything it wouldn't otherwise have done. Ball argues that this is normally the case when a check is paid to satisfy a preexisting (or antecedent) debt and that Ball therefore couldn't be found to have had the intent to defraud. Bell cites some out-of-state cases in support of what he calls the antecedent-debt rule, which he contends means that when a "check was given in payment of [a] past-due debt for services rendered . . . there can be no intent to defraud as a matter of law."

But we are deciding this case based on Kansas law, not that of any other state. And we must determine the elements of the Kansas crime of passing a worthless check by looking at the statutory language. Ball points to no language in the Kansas statute that puts in place an antecedent-debt rule, and the statutory presumption in K.S.A. 2012 Supp. 21-5821(d) is directly contrary to such a rule. The presumption of an intent to defraud applies when a person issues a check that's turned down by the bank for insufficient funds. Nothing in the statutory language creating that presumption differentiates between cases in which the check is given for goods or services already received and cases in which the goods or services will be received directly in exchange for the check.

10

Consistent with this reading of our present statute, the Kansas Supreme Court has interpreted its similarly worded predecessors not to require that anything be received at the time the check is issued or delivered. *State v. Ringi*, 238 Kan. 523, 527, 712 P.2d 1123 (1986); *State v. Avery*, 111 Kan. 588, 592, 207 P. 838 (1922).

As a final check on Ball's sufficiency-of-the-evidence argument, let's consider the evidence presented—beyond the statutory presumption—on Ball's intent to defraud. "Intent to defraud" is statutorily defined as "an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property." K.S.A. 2017 Supp. 21-5111(o). "Property" is defined as "anything of value, tangible or intangible, real or personal." K.S.A. 2017 Supp. 21-5111(w). So if Ball wanted Tri-Ko to give up any legal right by tendering the check, there'd be an intent to defraud even if the check was primarily intended to pay a preexisting debt for services to Richard.

Taking the evidence in the light most favorable to the State, Ball knew full well when he gave the check to a judge to give to Tri-Ko that there weren't funds in the account to cover it. Monthly account statements showing balances less than the amount of the check had been sent to Ball's office—and Ball had been delaying giving the check, finally giving it to the judge only on the morning of a scheduled contempt hearing. When the judge gave the check to Tri-Ko's attorney at that hearing, Ball obtained the benefit of having Tri-Ko not proceed on its contempt claim that day. And it certainly appears that Ball intended to defraud both Tri-Ko and the court by tendering a worthless check to avoid contempt sanctions. Giving up any existing legal right constitutes a property interest sufficient to serve as valuable consideration for a contract. See *Price v. Bank*, 62 Kan. 743, 750, 64 P. 639 (1901); 3 Williston on Contracts § 7:46 (4th ed. 2017). Giving up any existing legal right also suffices for the property interest required for an intent to defraud under the worthless-check statute.

In sum, even without the statutory presumption, the State presented sufficient evidence to support the conviction. But the State's case was also properly supported by the statutory presumption, and Ball did nothing to counter it. Sufficient evidence supported the conviction for passing a worthless check.

II. *Sufficient Evidence Supported Ball's Conviction for Mistreatment of a Dependent Adult.*

We turn next to Ball's conviction for the mistreatment of a dependent adult. The State charged Ball with violating one specific form of that offense, defined by statute at the time of Ball's offense as

> "taking unfair advantage of a dependent adult's physical or financial resources for another individual's personal or financial advantage by the use of undue influence, coercion, harassment, duress, deception, false representation, or false pretense." K.S.A. 2012 Supp. 21-5417(a)(2).

As charged against Ball, then, the State had to prove:

1. taking unfair advantage
2. of a dependent adult's financial resources
3. for another's gain
4. by the use of deception, false representation, or false pretense.

Ball essentially makes three points about this conviction. We will consider each separately.

First, he claims the statute "did not contemplate criminal conduct . . . where a Conservator buffered the Dependent Adult from egregious conduct by a potential violator." As Ball notes, he was merely the attorney for the dependent adult's conservator.

12

But nothing in the statutory language sets up categories of people who cannot be held criminally responsible for taking unfair advantage of a dependent adult. If the elements set out by the statute are proved, a person has committed this offense.

Second, he claims that the statute contemplates only situations in which a party *takes* the dependent adult's financial resources *through* deception, false representation, false pretense, or another of the statutorily listed methods—but not when, as here, a party first takes the money under a lawful court order. Once again, there's nothing in the statutory language that supports Ball's argument. The statute criminalizes *taking unfair advantage* of the dependent adult's financial resources by the use of deception. It does not require *taking the property through deception*.

We acknowledge that Ball cites one unpublished opinion of our court that supports his argument on this point, *State v. Anderson*, No. 103,484, 2011 WL 4563072 (Kan. App. 2011) (unpublished opinion). In that case, a woman who had become a signatory on her elderly mother's checking account misused funds for her own personal use. Our court said the "gist of the offense charged" was "taking the financial resources of a dependent adult *by applying some form of pressure on the dependent adult causing him or her to turn over the assets*." (Emphasis added.) 2011 WL 4563072, at *2. Our court said that "the proscribed conduct" (such as deception or false pretense) must "be used as a means to unfairly obtain the victim's financial resources." 2011 WL 4563072, at *3. Because the elderly mother had voluntarily placed her daughter on the bank account, our court held the evidence insufficient to convict for mistreatment of a dependent adult. 2011 WL 4563072, at *3.

We cannot reconcile the *Anderson* decision with the statutory language. Perhaps there was some limitation in the *Anderson* charging document—our court's discussion of the proof required to convict came only after mentioning the "gist of the offense charged" as "taking the financial resources . . . by applying some form of pressure . . . ." But even

13

if that was not the case, we simply do not find a basis in the statute for Ball's claim that control over the dependent's financial resources must be gained by improper means. The statute makes illegal "taking unfair advantage" of the dependent's financial resources for another's gain by the use of deception. It does not outlaw "taking the financial resources by deception." We have listed the statutory elements as they apply to Ball's case from the statute and the charging document.

Ball notes in his appellate brief that the statute was amended in 2014 in a way that may be consistent with *Anderson* and Ball's argument. As revised, the statute outlaws "taking the . . . financial resources . . . through" several methods, including coercion and deception. See L. 2014, ch. 90, § 1; K.S.A. 2017 Supp. 21-5417(a)(2). But that was not the law when Ball committed his offense. We must follow the language of K.S.A. 2012 Supp. 21-5417; the statement we have provided of the elements of this offense match that statute.

Third, he argues generally that the evidence wasn't sufficient. But we find evidence in support of each of the statutory elements of the offense charged against Ball:

- *Taking unfair advantage*: The probate court ordered that Ball hold Richard's assets in Ball's trust account, but attorney Ball never paid Tri-Ko for the care given to Richard.
- *Of a dependent adult's financial resources*: Richard suffered a brain injury and has diminished mental capacity. No one disputes that he qualifies as a dependent adult.
- *For another's gain*: We don't know for sure whether Ball benefitted from the amounts paid from the account—he argues that someone else might have benefitted. But we certainly know that "another," not Richard, benefitted. The State presented evidence of payments for "Marsha's Dollhouse," a membership at "Curve's," and insurance, all things Richard did not need or, as far as the evidence showed, use.

14

- *By the use of deception, false representation, or false pretense*: By holding the funds in his trust account, he had agreed to hold them solely for Richard's beneficial use. Ball represented to the probate court that he held $38,297 of Richard's assets in trust. Before delivering an insufficient-funds check to the judge, Ball twice told Tri-Ko's attorney that he had sent her a check for the amounts due. The court could reasonably conclude that the funds were used for the benefit of someone other than Richard and that this was made possible by Ball's deceptive acts and statements.

We conclude that the State presented sufficient evidence to convict Ball of the mistreatment of a dependent adult.

III. *Ball Is Not Entitled to Reversal Based on Claimed Errors in the Charging Documents*.

Ball's final argument on appeal is that the district court lacked jurisdiction over the case because of errors in the charging document. Significantly, Ball does not cite *State v. Dunn*, 304 Kan. 773, Syl. ¶ 1, 375 P.3d 332 (2016), in which the Kansas Supreme Court held that the Kansas Constitution, not the charging document, bestows jurisdiction on Kansas district courts in criminal cases. The *Dunn* court also held that charging documents are sufficient if they "allege facts that, if proved beyond a reasonable doubt, would constitute a Kansas crime committed by the defendant." 304 Kan. 773, Syl. ¶ 2. We will consider the essence of Ball's complaints about the charging document under the *Dunn* standards. Ball generally argues that failings in the charging document left him without sufficient notice to defend the case. Jurisdiction claims aside, a criminal defendant has a constitutional right to notice of the charges being pursued. *Dunn*, 304 Kan. at 814.

Based on our review of the Amended Information, filed more than two months before Ball's trial, it alleged facts that if proved at trial would constitute a Kansas offense.

The worthless-check charge referenced the statutory requirements and a specific date and check:

> "Jerome A. Gorman, as District Attorney . . ., on behalf of the said State of Kansas, now, here, in and to the District Court . . . , information gives that . . . within the jurisdiction of this Court, on or about the 25th day of March, 2013, Don Charles Ball did unlawfully and with the intent to defraud, make, draw, issue or deliver or cause or direct the making, drawing, issuing or delivering of a check, order or draft for the payment of money or its equivalent, to-wit: check # 3207, in the sum of $32,296.46 payable to Tri-Ko, Inc., drawn on an account from Security Bank, knowing, at the time of the making, drawing issuing, or delivering of such check, order, or draft, that the maker or drawer had no deposit in or credits with the drawee or has not sufficient funds in, or credits with, the drawee for the payment of such check, order or draft in full upon its presentation, with said check, order or draft drawn for $25,000 or more, in violation of K.S.A. 21-5821(b)(1)(A)."

As we discussed in addressing Ball's sufficiency-of-the-evidence argument, we explained that the essential elements of the offense charged against Ball were (1) that he issued the check, (2) that he knew there were insufficient funds at that time to cover the check, and (3) that he gave the check with the intent to defraud. All of those were alleged in the charging document, and Ball has not identified any statutory element left out from the charge.

The mistreatment-of-a-dependent-adult charge also referenced statutory requirements, though its factual allegations were more general than the listing of a specific check and its amount in the preceding charge:

> "[O]n or between the 1st of January, 2012 and the 18th day of June, 2013, defendant, Don Charles Ball, did unlawfully and knowingly take unfair advantage of the physical or financial resources, to the extent of at least $25,000, but less than $100,000, of another,

16

to-wit: Richard White, III, who was eighteen years of age or older and who was unable to protect his/her own interests, for the defendant's personal or financial advantage, by the use of undue influence, coercion, harassment, duress, deception, false representation or false pretense in violation of K.S.A. 21-5417(a)(2) & (b)[2](D)."

On this charge, as we discussed earlier, the State had to prove that Ball, then, the State had to prove: (1) took unfair advantage (2) of a dependent adult's financial resources (3) for another's gain (4) by the use of deception, false representation, or false pretense.

There is arguably at least a small mismatch between the factual allegations contained in the charging document and the State's evidence. The charging document alleged Ball used the dependent adult's resources "for the defendant's personal or financial advantage." At trial, arguably the State didn't prove whether the funds were used for Ball's expenses or those of someone else—though we think a fact-finder might well have inferred that it was for Ball's use or benefit given that he made false statements and acted deceptively to cover up that funds were missing rather than report a theft from his trust account to police. But even if the allegation that Ball used the funds for his own personal financial advantage was an error in the charging document, it wouldn't require reversal of Ball's convictions. The error still would be subject to review to see whether it was harmless, *Dunn*, 304 Kan. 773, Syl. ¶ 7; See *State v. Rodriguez*, 305 Kan. 1139, Syl. ¶ 4, 390 P.3d 903 (2017). And here, Ball heard the State's basic case in a preliminary hearing well before trial. We find no deficiency in the charging document that would have impaired Ball's ability to defend the case in any substantial way.

We affirm the district court's judgment.