CHARLES ROBINSON, Appellant, *v.* HUGH J. JEWETT, as Receiver, etc., Respondent.

Prior to April 8, 1875, A. D. & M. were lessees of certain stock-yards. The N. S. Y. Co., which had succeeded to the business, was in occupation and possession thereof either with said firm or the U. S. Y. & M. Co. This lease expired May 1, 1875, and on April 8, 1875, plaintiff took a lease for ten years in his own name. He was then a large stockholder, the president and a director of the N. S. Y. Co., which company had contracts with the E. R. Co. to provide a suitable place in New York city for the unloading of live stock carried by it. On May 28, 1875, at a meeting of the directors of said company, plaintiff being present and presiding, a resolution was passed to the effect that he, having taken a one half interest in the lease of said stock yards for the benefit of said company, it should assume the same and plaintiff should assign his interest to it. On the same day an instrument, the parties to which were declared to be the plaintiff, the U. S. Y. & M. Co., and the

N. S. Y. Co., was executed by plaintiff and the latter company, but not by the former, It recited the lease to 'plaintiff, and that it was taken by him for the joint benefit of said two companies. It purported to assign the lease to said companies, they to pay the rent reserved, and to perform all the covenants and agreements contained therein, and save plaintiff harmless therefrom. Defendant was, at that time, president of the N. S. Y. Co., and the representative of a majority of its stock; having discovered that plaintiff claimed to own the lease, and to avoid trouble he entered into a contract by which he, as receiver of the E. R. Co., guaranteed to plaintiff one-fifth of the net·profits of the business carried on in said yards, plaintiff agreeing to assign the lease to the N. S. Y. Co. There were no differences existing between plaintiff and defendant and the E. R. Co. at the time the agreement was executed. There was an action pending between the E. R. Co. and the N. S. Y. Co., and by an order of the court defendant was authorized to execute said agreement as receiver. Subsequently plaintiff executed and delivered an assignment of the lease to the N. S. Y. Co. · In an action to recover the share of the net profits so agreed to be paid, *held*, that the agreement was void for want of consideration; that plaintiff could not hold the new lease for his own benefit, nor deal with it as his own property, but the renewal enured to the benefit of the corporation for which he acted.

The performance of an act which the party is under a legal obligation to perform cannot constitute a consideration for a new contract.

(Argued June 3, 1889; decided October 8, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made at the January Term, 1888, which affirmed a judgment in favor of the defendant entered upon a report of the referee.

The action was brought to recover one-fifth of the net profits of the Fortieth street stock yards, in New York city, during the period from September 1, 1877, to October 1, 1878, and was founded upon the following alleged contract:

"Whereas, Charles Robinson has leased from Charles E. Appleby certain lands and premises, situated upon Thirtyninth, Fortieth and Forty-first streets and Eleventh avenue, in the city of New York, for the term of ten years from May 1, 1875, at the annual rent of $21,370 and taxes, as by reference to said lease will appear; and,

"Whereas, on the 28th day of May, 1875, the said Charles

Robinson entered into an agreement with the National Stock Yard Company, a corporation duly organized and existing under and by virtue of the laws of the state of New Jersey, for the assignment to said company of said lease; and,

"Whereas, the Erie Railway Company, a corporation duly organized under the laws of the state of New York, has become largely interested in said National Stock Yard Company, and thereby in said lease;

"Now, therefore, it is hereby agreed between said Robinson and said Erie Railway Company as follows:

"*First.* That said Robinson will assign to said National Stock Yard Company, whenever requested by resolution of its board of directors, or upon request of the Erie Railway Company so to do, the said lease, with proper covenants and conditions to secure the payment of the rent of said premises, and the security and indemnity of him, said Robinson, by forfeiture of said lease or transfer in the event of failure to pay said rent by said assignee or otherwise.

"*Second.* That the Erie Railway Company, or the receiver of said company, guarantees the payment, on the part of said National Stock Yard Company, of the rents and taxes of said premises, as provided for in said lease; and that said company, their successors or assigns, will assume and perform all the obligations assumed by said Robinson in said lease.

"*Third.* That said Erie Railway Company, or said receiver of said company, on its behalf, guarantees to said Robinson, from the date of said transfer, the payment by said National Stock Yard Company of one-fifth of the net profits arising from the business to be carried on upon said premises, or from their use or occupancy; and, to arrive at said amount, it is agreed that accurate books of account shall be kept of the business transacted at or upon said premises and received for their use and occupancy; that balance sheets shall be made up and settlements and payments made in accordance therewith, semi-annually, viz., on the first day of August and the first day of February of each year.

"In witness whereof, the party of the first part hath here-

unto set his hand and seal and the party of the second part has caused its corporate seal to be hereunto affixed, and these presents to be subscribed by its president, and the receiver of the said Erie Railway Company, the party of the second part, hath also set his hand and seal in his capacity as such receiver, the day and year first above written.

(Signed.) "CHARLES ROBINSON. [L. S.]

[Seal of Erie Ry. Co.]    (Signed.) "H. J. JEWETT,

"*Receiver Erie Railway Co.*

In presence of :

(Signed.) "C. G. BARBER.

Attest: "A. R. MACDONOUGH,

"*Secretary.*"

The referee found, as a fact, that no profits were earned, and dismissed the complaint.

Further facts appear in the opinion.

*Joseph H. Choate* for appellant. Plaintiff was bound by no prior contract to assign the lease to the National Stock Yard Company without compensation. (Bishop on Contracts, §§ 391, 392; Lawson on Presumptive Ev. 81; *Richards* v. *Waring,* 39 Barb. 42 ; 50 Keyes, 576.) The National Stock Yard Company had not even gained a-half interest in the lease. (*Townsend* v. *Corning,* 23 Wend. 435, 443, 444 ; *Townsend* v. *Hubbard,* 4 Hill, 351.) While plaintiff could not hold the lease himself as against the National Stock Yard Company, he was not obliged to assign the whole lease or to assign any share therein to the company without proper indemnity against his financial responsibility thereunder ; and a mere covenant to indemnify would not have been *per se* proper indemnity. (*Hapgood* v. *Hewitt,* 119 U. S. 226 ; *Wyckoff* v. *De Graaf,* 98 N. Y. 134 ; 1 Lewin on Trusts, 185 ; id. [5th ed.] 147 ; Thompson on Liability of Officers, 361 ; *Keech* v. *Sandford,* 1 Lead. Cas. in Eq. 44 ; *Fitzgibbon* v. *Scanlon,* 1 Dow. [H. L.] 261, 266 ; *Giddings* v. *Giddings,* 3 Russ. 241, 260 ; *James* v. *May,* L. R., 6 H. L. 328 ; *Davoue* v. *Fanning,* 2 Johns. Ch. 252, 257 ; *Phyfe* v. *Wardell,* 5 Paige,.

280; 2 Pomeroy's Eq. Jur. § 1077; 1 Perry on Trusts, §§ 196, 197; *Griffin* v. *Griffin*, 1 Sch. & Lef. 352, 354; *Mills* v. *Hill*, 3 H. L. C. 828, 871; *Simmons* v. *Bolland*, 3 Meriv. 547; *Evans* v. *Wood*, L. R., 5 Eq. 9, 16.) Had plaintiff been even under express agreement with the National Stock Yard Company to assign to it the lease on demand without indemnity, yet the contract in suit would have been on valid and valuable consideration. (Pollock on Contracts, 162, 163; *Scotson* v. *Pegg*, 6 H. & N. 295, *Shadwell* v. *Shadwell*, 9 C. B. [N. S.] 159; *Wyckoff* v. *De Graaf*, 98 N. Y. 134.) A compromise of a claim of which there can be any doubt, there being no bad faith or concealment, is a valid and highly favored consideration. (*Feeter* v. *Weber*, 78 N. Y. 334; *Dunham* v. *Griswold*, 100 id. 224, 226; *White* v. *Hoyt*, 73 id. 505, 514; *Kidder* v. *Horrobin*, 72 id. 159, 169; *Wehrums* v. *Kuhn*, 61 id. 623; *Flannagen* v. *Kilcome*, 58 N. H. 443; *Graham* v. *Meyer*, 99 N. Y. 611; *Russell* v. *Cook*, 3 Hill, 504; *Crans* v. *Hunter*, 28 N. Y. 389; *Ins Co.* v. *Watson*, 59 id. 395; *Cooper* v. *Parker*, 14 C. B. 121; 15 id. 822; *Callisher* v. *Bischoffsheim*, L. R., 5 Q. B. 449; *Clark* v. *Gamwell*, 125 Mass. 428, 431; *Clark* v. *Turnbull*, 47 N. J. Law, 265; *Morey* v. *Town of Newfane*, 8 Barb. 645, 653; *Boffinger* v. *Tuyes*, 120 U. S. 198, 205; *Conover* v. *Stilwell*, 34 N. J. Law, 4, 58.) Defendant cannot raise the plea of *ultra vires*, having enjoyed the fruits of his contract. (*Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Woodruff* v. *E. R. Co.*, 93 id. 609; *Mayor, etc.,* v. *Sonneborn*, 21 N. E. R. 121; *Weeks* v. *Weeks*, 106 N. Y. 626.) The contract was valid, although in form a guaranty of payment by the National Stock Yard Company, which itself was not bound to pay. (*Williams* v. *Marshall*, 42 Barb. 524; *Zabriskie* v. *R. R. Co.*, 23 How. [U. S.] 381, 399; *Conn. Mut. Ins. Co.* v. *R. R. Co.*, 41 Barb. 9, 28; *Cardell* v. *McNiel*, 21 N. Y. 336, 340, 341.) The contract is the contract of defendant, not of the Erie Railway Company. (*Barton* v. *McLean*, 5 Hill, 256, 259; *Hill* v. *Smith*, 21 How. [U. S.] 283, 286; *Moorehouse* v. *Crangle*, 36 Ohio, 130; *Johnson* v. *Gilbert*, 4 Hill, 178, 180;

*Van Bokkelen* v. *Taylor*, 62 N. Y. 105, 108, 109.) Profits were made during the period in controversy from the use and occupancy of the yards; plaintiff was, therefore, entitled to judgment. (*Armory* v. *Delamirie*, 1 Smith's Lead. Cas. [ed. 1885] 688; *Lupton* v. *White*, 15 Ves. 432, 439; *Walmsley* v. *Walmsley*, 3 J. & La T. 556; *Gray* v. *Haig*, 20 Beav. 219; *Dean* v. *Thwaite*, 21 id. 621; *Stainton* v. *Carron Co.*, 24 id. 346; *Hooley* v. *Gieve*, 9 Abb. N. C. 8; *Jewett* v. *Dringer*, 30 N. J. Eq. 291; 1 Sutherland on Damages, 784; Story on Agency, §§ 205, 332; 1 Story's Eq. Jur. §§ 468, 623.)

*William D. Shipman* for respondent. The performance of an act which can be enforced by an appropriate proceeding at law or in equity cannot constitute a good consideration for a promise. (1 Addison on Contracts, 13; *Crosby* v. *Wood*, 6 N.Y. 369; *Gibson* v. *Renne*, 19 Wend. 389; *Vanderbilt* v. *Schreyer*, 91 N. Y. 392; *Seybolt* v. *N. Y., L. E. & W. R. R. Co.*, 95 id. 563; *Miller* v. *Holbrook*, 1 Wend. 317; *Vilas* v. *Jones*, 1 Coms. 274; *McDonald* v. *Neilson*, 2 Cow. 139; *Jennings* v. *Chase*, 10 Allen, 526; *Collins* v. *Godfrey*, 1 Barn. & Adol. 950; *Sweany* v. *Hunter*, 1 Murphy [N. C.] 181; *Stilk* v. *Myrick*, 2 Camp. 317; *Mitchell* v. *Reed*, 61 N. Y. 123.) Even if the alleged contract were not void for want of a consideration, still the plaintiff cannot recover; for this alleged contract, as to the defendant is one of guaranty solely, and must be based on an original promise by the National Stock ard Company to Mr. Robinson. No such promise was ever made and the contract of guaranty, therefore, falls. (*Gallagher* v. *Nichols*, 60 N. Y. 438; Burge on Suretyship, 6.)

BROWN, J. If it was necessary to the determination of this case, to decide whether the evidence showed that profits were earned at the premises described in the lease to the plaintiff during the period mentioned in the complaint, we should feel constrained to differ with the learned referee upon that question of fact, and hold that the undisputed testimony was that profits were earned.

The guaranty was "of one fifth of the net profits arising from the business to be carried on upon said premises, *or from their use and occupation*," and it appears, without dispute, that during the period covered by this action nearly six hundred thousand hogs were unloaded from the cars of the New York Central & Hudson River Railroad Company at said premises, and for such use of the property nearly forty-eight thousand dollars was paid by said railroad company to the Union Stock Yard and Market Company. This sum was largely in excess of the expense of the maintenance of the yards, and such excess represented net profits for the use of the yards.

The guaranty was not limited to the profits earned by the National Company, but included all that accrued from the business carried on on the premises, or from their use and occupation, and, therefore, embraced in its terms the profits earned by the Union Stock Yard and Market Company, which, during the period in question, used the property jointly with the National Company.

It is of no consequence that the money paid by the railroad company was not paid at the stock yards, nor that the stock yard company, after its receipt from the railroad company, paid it into a pool with receipts from other railroads, for the use of other stock yards. The fact remains that it was a receipt for the use of the stock yards in question. And this conclusion is not weakened because the precise relations existing between the New York Central and Hudson River Railroad Company and the Union Stock Yard and Market Company were not shown on the trial. It was shown that a place to unload the stock was a necessity to the proper discharge of this branch of the railroad business, and that the New York Central and Hudson River Railroad Company had no other place in the city of New York to unload the hogs carried upon its road, and used and occupied the premises in question for that purpose. That during the period covered by the suit it paid to the Stock Yard and Market Company a sum equivalent to eight cents a head for every hog discharged at the

Fortieth street yards. This evidence was certainly sufficient to make out a *prima facie* case for the plaintiff in the absence of any testimony tending to contradict it or destroy its force, and admitted of no inference other than that the money so paid was paid for the use and occupation of the premises in question.

Inasmuch, however, as we think, the judgment must be affirmed on other grounds, it is unnecessary to state more fully the reasons for our conclusions as to this branch of the case.

It is claimed by the respondent that the contract upon which the action is founded is without any valid consideration, and this point, we think, is fatal to any recovery on the part of the plaintiff.

It appears that, prior to April 8, 1875, the copartnership of Allerton, Dutcher & Moore were the lessees of the premises known as the Fortieth street stock yards, and at and prior to that date the National Stock Yard Company was in the occupation and possession thereof jointly, either with said copartnership or with the Union Stock Yard and Market Company.

The evidence does not show when the Union Stock Yard Company was incorporated. It appears, however, to have been in existence in the month of May, 1875, and probably succeeded to the business of Allerton, Dutcher & Moore, and its organization, if not completed, was contemplated by the parties at the time of the lease to the plaintiff. The lease to the copartnership expired on May 1, 1875, and on April 8, 1875, the plaintiff took a lease in his own name for the premises from Charles E. Appleby for the term of ten years at an annual rent of $21,370, besides taxes and assessments.

At that time the plaintiff was a large stockholder in the National Stock Yard Company and a director and president thereof, and had been president since January, 1870.

On May 28, 1875, at a meeting of the board of directors of said Stock Yard Company, called by order of the plaintiff as president, and at which he was present and presided, the following resolution was adopted:

" *Whereas*, Mr. Charles Robinson, for the benefit of this

company, has taken a half (½) interest in the lease of the West Fortieth street yards.

*Resolved,* Therefore, that the same be assumed by the National Stock Yard Company, and that Mr. Robinson assign his interest in the lease to this company."

On the same day the plaintiff executed an instrument, the parties to which were declared to be the plaintiff, the Union Stock Yard and Market Company, and the National Stock Yard Company. It recited the lease from Appleby to the plaintiff, and that "said lease of said premises was taken by said Robinson for the joint benefit of the Union Stock Yard and Market Company, and the National Stock Yard Company." It then purported to assign the said lease to the said two companies, and said companies agreed to pay the rent reserved and perform all the covenants and agreements therein contained to be performed by said Robinson, and to hold said Robinson harmless on all covenants therein. This instrument was executed by the plaintiff and the National Stock Yard Company, but not by the Union Company.

It was produced on the trial by the defendant, who at that time was the president of the National Company and the representative of the majority of the stock, and it is a fair presumption from this fact that it was after its execution delivered to the National Company.

The defendant was appointed receiver of the Erie Railway Company by two orders of the Supreme Court, dated, respectively, May 26, and June 15, 1875.

On the 28th day of July, 1875, the defendant presented to the Supreme Court a petition in which he set forth a series of contracts which had been executed between the Erie Railway Company and the National Stock Yard Company in reference to the stock transported by the railway company, and alleged that said contracts were very prejudical to the interests of the railway company, and were fraudulent and void, and that legal proceedings had been instituted in New Jersey by the railway company, and were then pending, for the purpose of having such contracts set aside.

That such proceedings might be continued for a long time, and that the use of the property, then in the possession of the Stock Yard Company, leased to it by the railway company, was necessary to the railway company to enable it to carry on the business of transporting stock, which was a large and important branch of the freight business of said railway company.

That it was deemed advisable in furthering the best interests of the trusts reposed in the petitioner to control the contracts in evidence, and, so far as possible, to get rid of them by purchasing the outstanding stock of the Stock Yard Company and thus controlling the corporation, and to that end, subject to the approval of the court, two contracts had been entered into with the plaintiff which were annexed to the petition. One of these contracts was the one in suit. The other was for the purchase of three thousand six hundred and twenty-three shares of the stock of the Stock Yard Company for the sum of $53,000.

The petition further set forth that the stock so purchased from the plaintiff, together with one thousand eight hundred and twenty-two shares agreed to be purchased from the widow of James Fisk, and that already held by the railway company, would give to the petitioner the absolute control of the Stock Yard Company, enabling it to be managed in harmony with the interests of the railway company. Leave was, therefore, asked to execute and perform the contracts according to the terms thereof.

An order having been granted in accordance with the prayer of the petition, the two contracts were executed. The plaintiff thereupon transferred to the railway company the stock held or controlled by him in the Stock Yard Company, and received payment therefor as provided in the contract.

Subsequently he executed and delivered to the Stock Yard Company an assignment of the Appleby lease, and, on August 2, 1875, the Stock Yard Company directed its counsel to take no proceedings in the litigation pending between the Erie

Railway Company and the National Stock Yard Company without further special directions, " the matters in controversy having been adjusted."

The case contains very little oral testimony as to the contract in question. The plaintiff was not sworn as a witness. The defendant testified as follows : " When I became disturbed in regard to the relation of Mr. Robinson to the interests of the Erie Railway in the transportation and handling of its stock, I proposed to buy out his interest in the Stock Yard Company. My first supposition was, as a matter of course, that the lease went with it. Before we got through, however, after I paid for a large part of the stock, Mr. Robinson developed the fact that he claimed that lease for himself. To avoid any trouble I agreed to give him, if he would relinquish that claim, a portion of the profits arising from the business in that yard." Upon this evidence the question arises whether the assignment of the lease to the National Stock Yard Company was a good consideration · to support defendant's promise to pay to plaintiff one-fifth of the net profits arising from the use and occupation of the leased premises.

It is claimed, on behalf of the plaintiff, that he was under no legal obligation to assign the lease to the National Company, and even if he was, the contract in suit was part of a general compromise, and was, therefore, based on a consideration highly favored in the law.

There were no differences existing between the Erie Railway Company or defendant, as its receiver, and the plaintiff at the time the agreement under consideration was executed. The pending litigation was between the Railway Company and the Stock Yard Company. The two contracts entered into by the receiver left the litigation and all differences between the two corporations untouched and still existing. The contracts related solely to plaintiff's property, and by their terms had no connection with the settlement or compromise of any of the matters in controversy between the corporations.

It is true that the avowed purpose of the purchase of plaintiff's stock was to place the Stock Yard Company under con-

trol of the railway company and thus end the litigation, but this was to be the result and was not the subject-matter of the contracts.

The plaintiff did not own or control a majority of the stock of the Stock Yard Company, and the purchase of his stock was but a step toward the final settlement of the litigation. In the agreements between the parties there was, therefore, no compromise and no settlement of any litigation.

We come, then, to the question whether the plaintiff was under a legal obligation to assign the lease to the National Company. The referee made no finding upon this question and none appears to have been asked. As its determination was not necessary to support the judgment rendered, we can presume none. But on the facts before us there can be but one answer to this inquiry.

Those who are in possession of lands under a lease have an interest therein beyond the subsisting term usually called the tenant's right of renewal. Between the landlord and tenant this interest cannot strictly be denominated a right or estate, but is merely a hope or expectation, there being, in the absence of contract, no way, legal or equitable, of compelling a renewal. But, as between third persons, the law recognizes this interest as a valuable property right, and the renewal as a reasonable expectancy of the tenants in possession. (*Phyfe* v. *Wardell,* 5 Paige, 268; *Keech* v. *Sandford,* 1 W. & T. Lead. Cases in Eq. 48, and note; *Mitchell* v. *Reed,* 61 N. Y. 123; *Armour* v. *Alexander,* 10 Paige, 571; *Gibbes* v. *Jenkins,* 3 Sandf. Ch. 143; *Moody* v. *Matthews,* 7 Ves. 185, and note; *Featherstonhaugh* v. *Fenwick,* 17 Ves. 298.) The authorities are numerous where courts of equity have recognized the right of renewal so far as to decree that new leases, granted upon the supposition of a right of renewal, should be for those interested in the old lease, and those who had taken the new lease have been decreed to hold it as trustee for the first lessee. The principle has been frequently applied in partnership cases where one partner, without the knowledge of his copartner, has taken a renewal for his own benefit of

premises leased by the firm, and in such cases the lease so taken enures to the benefit of the firm. (*Struthers* v. *Pearce*, 51 N. Y. 357; *Mitchell* v. *Reed*, 61 id. 123.) The renewal lease is in equity regarded as a continuance of the original lease, so far as concerns the legal and equitable rights of those who had an interest in the old lease. (*Moody* v. *Matthews, supra.*) The rule grows out of the relation of trust and confidence between the parties interested, and falls within the principle that a trustee cannot profit from the estate for which he acts. It is appropriately applied to a trustee of a corporation taking in his own name a renewal lease of the premises in possession of the corporation.

Every consideration, legal or moral, requires that the trustee should protect the corporation and its property and see that the interest of other stockholders suffer no loss from his default. He cannot speculate with the corporate property or deal with it as his own. Between the trustee and the corporation the right of renewal of the lease is a property right, and if the lease is renewed in the name of the officer, it enures to the benefit of the corporation. In this case the National Company held contracts with the Erie Railway Company which made it necessary that it should provide a suitable place in the city of New York to unload and care for the stock carried on the railroad. These contracts extended beyond May 1, 1875, when the old lease expired, and it was essential to the execution of these contracts that the lease should be renewed.

The duty of procuring the renewal seems to have rested upon the plaintiff, and having obtained the new lease he could not hold it for his own benefit, nor deal with it as his own property, but the renewal enured to the benefit of the corporation for which he acted. Moreover, plaintiff does not appear, prior to the date of the agreement in suit, to have denied the right of the National Company to one-half of the lease, but admitted it in assenting to the resolutions of the directors at the meeting of May 28, 1875, and in the recitals in the agreement of the same date which I have quoted. It also appears from this resolution and agreement that the other half of the

lease was held by the plaintiff for the Union Stock Yard and Market Company. Arrangements similar to those existing between the National Company and the Erie Railway Company existed between the New York Central Railroad and the Union Company, and the latter company was under a like necessity as the National to provide a place in the city of New York to unload the stock from the Central road. The National Company had admitted the right of the Union to one-half of the lease, and there can be no question on the evidence but that plaintiff took and held the new lease in trust for both corporations; and this conclusion is corroborated by the arrangement between the two stock yard companies, made soon after the assignment of the lease for the joint use and occupation of the yard. Having taken the lease for the benefit of the two corporations in his own name, without their assent, the plaintiff was bound to transfer it to them upon demand.

In assigning the whole lease to the National, that company took it subject to the rights of the Union Company, and the legal effect of the transfer was to give to the National Company only such share in the lease as it was entitled to. In this there was no consideration for defendant's promise. The plaintiff did that only which he was bound to do, and that which a court of equity would have compelled him to do, and the corporation received only that to which it was legally entitled. The performance of an act which the party is under a legal obligation to perform cannot constitute a consideration for a new contract. (*Bartlett* v. *Wyman*, 14 Johns. 259; *Crosby* v. *Wood*, 6 N. Y. 369; 2 Parsons on Cont. 437; *Vanderbilt* v. *Schreyer*, 91 N. Y. 392.)

The agreement sued on was, therefore, for the reasons stated, void and the judgment should be affirmed, with costs.

All concur.

Judgment affirmed.